exchanges in the International Voyager Fund, 99% of the International Growth Exchanges Fund, and 98% of the money market exchanges. Exchanges occur when shares in one fund are exchanged for shares in another fund in the same family; and this is a standard mechanism for carrying out market timing transactions. The plan participants also engaged in frequent exchanges between the Voyager Fund and the Stable Value Fund from at least 2000.

54.     Putnam's motivation in allowing this trading to continue was to secure other lucrative business from the plan sponsors. For example, in an e-mail dated March 17, 2003, Putnam employee Robert Gowdy explicitly stated how the scheme was instrumental in Putnam securing additional business from the retirement fund.

55.     On September 11, 2003, the Commonwealth of Massachusetts sent its first subpoena regarding market timing and mutual fund practices to Putnam. Shortly thereafter, Putnam finally took action by restricting the ability of plan participants to make transfers into the Voyager Fund. It did not, however, disclose the plan's timing activities.

56.     Putnam has also allowed rampant market timing by other plans' members, once again in order to secure other lucrative investment advisory business from them.

57.     In early 2000, for example, Putnam Dedicated Services Representatives at the Norwood office became aware that plan participants of one such other plan were making frequent exchanges between the Putnam New Opportunity Fund or Putnam OTC Emerging Growth Fund into the Putnam Stable Value Fund. These exchanges, into and out of these funds, were attempts at market timing the funds. Once again, Putnam did nothing to stop it or advise the funds or its shareholders as to what was going on.

-17-

### The Misconduct At Putnam Is Disclosed

58.   Putnam covered up the market timing of its employees and its key clients for years, and this coverup would be continuing to this day were it not for the investigations of the Commonwealth of Massachusetts and the State of New York. It was not until October 21, 2003, that an article which appeared in the *Boston Globe* first revealed that Putnam was engaged in market timing activities.

59.   Then, on October 24, the Putnam Funds disclosed the existence of these timing trades. On that day it issued a press release that stated:

> The information available to us indicates that, although Putnam's systems and procedures have been effective in detecting and stopping the vast majority of attempts to market time Putnam funds in recent years, they have not been perfect. We now know, for example, of market timing activity in at least one 401(k) client account that was detected but not stopped in a timely manner. We have also learned of market timing activity in a small number of Putnam employee retirement accounts, most of which occurred, was detected, and was stopped by management in 2000. Unfortunately, this activity involved several investment professionals who traded in their own funds. These individuals are no longer involved in the management of your funds.

The stampede out of the Putnam Funds by huge institutional investors, including many public employee pension plans, started immediately.

60.   On November 3, 2003, Jeffrey W. Greenberg, Chairman and Chief Executive Officer of Marsh & McLennan Companies, Inc., the parent corporation of Putnam, announced the removal of Lawrence Lasser as President and CEO of Putnam. The four money managers who timed funds of which they were in charge – Scott, Kamshad, Lode, Peters, Prusko and Perfetuo – were taken off their money managing duties, placed on leave and are scheduled to depart Putnam.

### Putnam Funds' Trustees Are Too Conflicted To Act

61. As of December 31, 2002, there were 101 funds in the Putnam family of funds which comprise the Putnam Funds. Each of the 101 funds has a board of trustees whose function it is to oversee the conduct of the fund's business. All 101 funds are identical in this respect, with the same thirteen person board. The members of the board and their compensation for 2002 is as follows:

| No. | Name | Position(s) at The Putnam Funds | Salary for Putnam Funds Trusteeship[1] |
|---|---|---|---|
| 1. | Jameson A. Baxter | Trustee, since 1994 | $216,750 |
| 2. | Charles B. Curtis | Trustee since 2001 | $206,250 |
| 3. | John A. Hill | Trustee since 1985; Chairman since 2000 | $388,250 |
| 4. | Ronald J. Jackson | Trustee since 1986 | $207,250 |
| 5. | Paul L. Joskow | Trustee since 1997 | $203,750 |
| 6. | Elizabeth T. Kennan | Trustee since 1992 | $204,250 |
| 7. | John H. Mullin, III | Trustee since 1997 | $210,000 |
| 8. | Robert E. Patterson | Trustee since 1984 | $211,000 |
| 9. | W. Thomas Stephens | Trustee since 1997 | $203,250 |
| 10. | W. Nicholas Thorndike | Trustee since 1992 | $204,500 |
| 11. | Lawrence J. Lasser | Trustee 1992-03 | $1,000,000 (plus annual bonus of $7,000,000 and stock) |
| 12. | George Putnam, III | Trustee since 1984; President since 2000 | $253,000 |
| 13. | A.J.C. Smith | Trustee since 1986 | $1,250,000 (plus incentive bonus of $1,250,000 and stock) |

---

[1] *See* Proxy for Putnam Master Income Trust, dated October 7, 2003. Lasser and Smith are paid directly for these and other services by MMIC directly. *See* Proxy for MMIC, dated May 15, 2003.

62. As a consequence of overseeing the business conduct of the 101 Putnam Funds, the board members are too conflicted, too distracted, and too overburdened to adequately and reasonably oversee the business operation of the Putnam Funds, including, Plaintiffs' Funds. The weight of their responsibilities has and continues to preclude adequate oversight with regard to the conduct of the funds and the funds' contractual relationship with its investment advisor and the appropriate compensation to be paid thereunder.

## COUNT I
### (Violations of ICA § 36(b))

63. Plaintiffs incorporate by reference paragraphs 1-62.

64. Although this cause of action is brought for the benefit of Plaintiffs' Funds, plaintiffs bring it directly as shareholders under ICA § 36(b), 15 U.S.C. § 80a-35(b).

65. Section 36(b) creates a fiduciary duty on the part of all investment advisors, for the benefit of the funds they manage, in connection with the advisors' receipt of fees. This duty applies not only to the terms of the advisory fee agreements, but also to the manner in which advisors seek approval of such agreements. Thus, among other things, §36(b) prohibits advisors from soliciting the approval of any advisory agreement from a fund board by use of false or misleading information, or by failing to disclose information material to the board's decision regarding their compensation. Information concerning conflicts of interest is particularly important to the funds and to their independent directors.

66. ICA § 36(b), 15 U.S.C. § 80a-35(b), creates a private right of action for all fund shareholders to enforce these duties in a direct action, even though the direct beneficiary of such an action is the fund itself.

67. By permitting, condoning and not disclosing the fact that shares of Putnam Funds were being market timed by senior Putnam portfolio managers, and that favored clients were being allowed to time many of these funds systematically, Putnam breached its fiduciary duties with respect to the receipt of compensation for services to Plaintiffs' Funds and in contravention of the ICA § 36(b), 15 U.S.C. §§ 80a-35(b).

## COUNT II
### (Violation of § 20(a))

68. Plaintiffs incorporate by reference paragraphs 1-62.

69. Although this cause of action is brought for the benefit of the Plaintiffs' Funds, plaintiffs Anthony Antoniello and Nancy Ann Antoniello, and Charles Kalivas and Cathy Kalivas, also bring this cause of action directly, as shareholders, under § 20(a) of the ICA, 15 U.S.C. § 80(a)-20(a).

70. Section 20(a) of the ICA requires that all proxy statements issued must comply with the proxy rules issued by the Securities and Exchange Commission. SEC Rules prohibit misstatements of material facts and failures to disclose facts that render misleading the information that was actually disclosed.

71. Section 15(a) of the ICA, 15 U.S.C. § 80(a)-15(a), requires that all investment advisory contracts contain a precise description of all compensation to be paid thereunder and must be approved, initially, by a majority of fund shareholders, and that extensions of such contracts must be approved either by the directors or by the shareholders.

72. Putnam sought approval of the investment advisory contracts for the Putnam New Value Fund and Putnam International New Opportunities Fund from the shareholders of the fund by

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: Boston, Massachusetts
November 26, 2003

Respectfully submitted,

Alan L. Kovacs
BBO# 278240
**LAW OFFICE OF ALAN L. KOVACS**
2001 Beacon Street
Suite 106
Boston, MA 02135
T: (617)964-1177
F: (617)332-1223


Stanley M. Grossman
Marc I. Gross
H. Adam Prussin
Ronen Sarraf
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, New York 10017
T: (212) 661-1100
F: (212) 661-8665

Richard J. Vita
BBO # 510260
**LAW OFFICES OF RICHARD J. VITA, P.C.**
77 Franklin Street, Suite 300
Boston, Massachusetts 02110
T: (617) 426-6566
F: (617) 357-1612

Attorneys for Plaintiffs